ROBINSON & COLE LLP
Adam J. Petitt, Esquire (N.J. ID # 020822008)
1055 Washington Boulevard
Stamford, CT 06901
Tel: (203) 462-7564
Email: apetitt@rc.com

*Attorney for Plaintiffs Aetna Network Services LLC*
*And Aetna Life Insurance Company*

**UNITED STATES DISTRICT COURT**
**DISTRICT OF NEW JERSEY**

---------------------------------------------------------------- x

| | |
|---|---|
| AETNA NETWORK SERVICES LLC, AETNA LIFE INSURANCE COMPANY, : | Case No. |
| *Plaintiffs,* : | |
| v. : | |
| AMIT POONIA, ADITY SHARMA, SPRINGFIELD SURGERY CENTER LLC, PARK AVENUE SURGERY CENTER LLC, BROOKLINE SURGERY CENTER LLC, INTERVENTIONAL PAIN MANAGEMENT AND ORTHO-SPINE CENTER LLC, NEW YORK INTERVENTIONAL PAIN MANAGEMENT, P.C., and PREMIER ANESTHESIA GROUP, P.C., : | **COMPLAINT** |
| *Defendants.* : | |

---------------------------------------------------------------- x

Plaintiff Aetna Network Services LLC, by and through its attorneys,

Robinson & Cole LLP, by way of Complaint against Defendants Amit Poonia,

Adity Sharma, Springfield Surgery Center LLC, Park Avenue Surgery Center

LLC, Brookline Surgery Center LLC,[1] Interventional Pain Management and Ortho-Spine Center LLC, New York Interventional Pain Management, P.C., and Premier Anesthesia Group, P.C. (collectively, "Defendants"), alleges as follows:

## PARTIES

1.  Plaintiff Aetna Network Services LLC is a Connecticut limited liability company with a principal place of business at 151 Farmington Avenue, Hartford, Connecticut.  Plaintiff Aetna Life Insurance Company is a citizen of Connecticut with its principal place of business in Hartford, Connecticut. Plaintiffs are referred to collectively herein as "Plaintiffs" or "Aetna."

2.  Upon information and belief, Defendant Amit Poonia ("Dr. Poonia") is an individual residing in Colts Neck, New Jersey. Dr. Poonia is married to Defendant Adity Sharma.

3.  Upon information and belief, Defendant Adity Sharma ("Dr. Sharma") is an individual residing in Colts Neck, New Jersey. Dr. Sharma is married to Dr. Poonia.

4.  Defendant Springfield Surgery Center LLC ("Springfield SC") is a New Jersey limited liability company. Its registered agent is Dr. Sharma and its principal business address registered with the New Jersey Secretary of State is 1001 Clifton Avenue, Suite 2A, Clifton, New Jersey. Upon information and belief,

---

[1] Springfield Surgery Center LLC, Park Avenue Surgery Center LLC, and Brookline Surgery Center LLC are referred to collectively as the "Surgery Centers."

2

all its members are residents of New Jersey.

5.    Park Avenue Surgery Center LLC ("Park Ave SC") is a New Jersey limited liability company with a principal place of business at 3848 Park Avenue, Edison, New Jersey. Upon information and belief, all its members are residents of New Jersey.

6.    Brookline Surgery Center LLC ("Brookline SC") is a New Jersey limited liability company with a principal place of business at 620 Cranbury Road, Suite 115, East Brunswick, New Jersey. Upon information and belief, all its members are residents of New Jersey.

7.    Interventional Pain Management and Ortho-Spine Center LLC ("NJ IPM") is a New Jersey limited liability company with a principal place of business at 1001 Clifton Avenue, Suite 2A, Clifton, New Jersey. Upon information and belief, all its members are residents of New Jersey.

8.    New York Interventional Pain Management, P.C. ("NY IPM") is a New York professional corporation with a principal place of business at 668 5th Avenue, Brooklyn, New York. Upon information and belief, all its members are residents of New Jersey or New York.

9.    Premier Anesthesia Group, P.C. ("Premier Anesthesia") is a New Jersey professional corporation with a principal place of business at 1001 Clifton Avenue, Suite 2A, Clifton, New Jersey. Upon information and belief, all its members are residents of New Jersey.

**JURISDICTION AND VENUE**

10.    The amount in controversy exceeds $75,000.

11.    This court has subject matter jurisdiction pursuant to 28 U.S.C. § 1332 based on diversity of citizenship.

12.    This court also has jurisdiction over the claims brought under 18 U.S.C. §§ 1961, *et seq.* (the Racketeer Influenced and Corrupt Organizations ("RICO") Act) pursuant to 28 U.S.C. § 1331.

13.    In addition, this court has supplemental jurisdiction over the subject matter of the claims asserted in this action pursuant to 28 U.S.C. § 1367.

14.    Venue is proper in the United States District Court for the District of New Jersey pursuant to 28 U.S.C. § 1391 because a substantial part of the events giving rise to this action occurred within this district.

**FACTUAL ALLEGATIONS**

15.    At a time when state and federal governments, private employers, and consumers struggle with the rapidly escalating cost of healthcare, Defendants devised a scheme to defraud Aetna out of tens of millions of dollars paid to out-of-network medical practices owned, operated, controlled by and/or affiliated with Dr. Poonia and Dr. Sharma. These actions were in violation of the New Jersey Insurance Fraud Prevention Act, N.J.S.A. 17:33A-1 through -30 ("IFPA"), and further constitute common law fraud, unjust enrichment, and tortious interference with contract.

16.     Aetna brings this claim to recover damages, treble damages, and punitive damages it suffered as a result of Defendants' fraudulent scheme, in which they have submitted inflated claims for reimbursement for medical services and have manipulated recently-enacted legislation—intended to avoid surprise medical bills to patients—for their own pecuniary gain.

## I.     Dr. Poonia and Dr. Sharma's Medical Practices

17.     Dr. Poonia and Dr. Sharma are a married couple who own and operate medical practices and facilities in New Jersey and New York, including NJ IPM, NY IPM, Premier Anesthesia, and the Surgery Centers.

18.     Dr. Poonia and Dr. Sharma submit out-of-network claims to Aetna for their professional fees.

### a.     *Springfield SC*

19.     Springfield SC entered into a Facility Agreement ("Springfield SC Facility Agreement") with Aetna, effective May 1, 2020, pursuant to which Springfield SC agreed to participate as an "in-network" provider of certain medical services with Aetna. *See* Exhibit A.

20.     The Springfield SC Facility Agreement requires claims arising out of or relating to the agreement to be settled by binding arbitration with the exception of claims seeking injunctive relief or any other form of equitable relief.  The claims against Springfield SC in this action either do not arise out of or relate to the Springfield SC Facility Agreement or are exempt from its arbitration provision.

*See id.*

21.    Dr. Poonia executed the Springfield SC Facility Agreement on behalf of Springfield SC and, as such, had actual knowledge of its terms at all times relevant to this action. *See id.*

22.    Dr. Poonia stated that he is Springfield SC's sole member on his application to enter into the Facility Agreement. *See* Exhibit B.

23.    Dr. Sharma is Springfield SC's registered agent and president. *See* Exhibit C.

24.    Although Springfield SC lists its principal business address at 1001 Clifton Avenue, Suite 2A Clifton, New Jersey with the New Jersey Secretary of State (*see* Exhibit C), its advertised address is 105 Morris Avenue, Springfield, New Jersey. *See* Exhibit D. Its notice address in its Facility Agreement is also 105 Morris Avenue, 1st Floor, Springfield, New Jersey. *See* Exhibit A.

25.    Springfield SC markets itself directly to the public, advertising itself as a "state-of-the-art outpatient ambulatory facility . . . specializ[ing] in interventional pain management and . . .  staffed with board certified, board eligible physicians who are always ready to provide quality care to their patients." *See* Exhibit D. It further advertises that it offers epidural steroid injections, facet block injections, radiofrequency ablations, major joint steroid injections, and spinal cord stimulator trials. *Id.*

### b.    *Park Ave SC*

26.    Park Ave SC entered into a Facility Agreement ("Park Ave SC Facility Agreement") with Aetna, effective November 15, 2025, pursuant to which Park Ave SC agreed to participate as an "in-network" provider of certain medical services with Aetna. *See* Exhibit E.

27.    The Park Ave SC Facility Agreement contains the identical arbitration provision as the Springfield SC Facility Agreement.  The claims against Park Ave SC in this action either do not arise out of or relate to the Park Ave SC Facility Agreement or are exempt from its arbitration provision. *See id.*

28.    Dr. Sharma executed the Park Ave SC Facility Agreement on behalf of Park Ave SC and, as such, had actual knowledge of its terms at all times relevant to this action. *See id.*

29.    Dr. Sharma is the sole member of Park Ave SC. Exhibit F.

30.    Like Springfield SC, Park Ave SC markets itself directly to the public, claiming to be "a multi-specialty Ambulatory Surgery Center (ASC) accredited by Joint Commission and Medicare-certified. Park Avenue Surgery Center specializes in Interventional Pain Management, Orthopedic Surgery, Podiatry, and Spine Surgery." Its promotional website continues, "Our physicians are board-certified with significant training and experience in their respective specialties." *See* Exhibit G.

### c.    Brookline SC

31.    Brookline SC entered into a Facility Agreement ("Brookline SC Facility Agreement") with Aetna, effective May 15, 2023, pursuant to which Brookline SC agreed to participate as an "in-network" provider of certain medical services with Aetna. *See* Exhibit H.

32.    The Brookline SC Facility Agreement contains the identical arbitration provision as the Springfield SC Facility Agreement.  The claims against Brookline SC in this action either do not arise out of or relate to the Brookline SC Facility Agreement or are exempt from its arbitration provision.

33.    Dr. Sharma is Brookline SC's registered agent and managing member. *See* Exhibit I.

34.    The Brookline SC Facility Agreement was executed by Dr. Amr Hosny, who signed the agreement as Brookline SC's medical director. *See* Exhibit H.

35.    Upon information and belief, this was done to mask Dr. Sharma's involvement in Brookline SC.

### d.    NJ IPM, NY IPM, and Premier Anesthesia

36.    NJ IPM, NY IPM, and Premier Anesthesia do not have provider agreements with Aetna and, as such, are "out-of-network."

37.    Dr. Sharma is an "Authorized Official" and Medical Director of NJ IPM. *See* Exhibit J.

8

38.     Dr. Poonia is an "Authorized Official" and Medical Director of NY IPM. *See* Exhibit K.

39.     Dr. Poonia is an "Authorized Official" and President of Premier Anesthesia. *See* Exhibit L.

40.     NJ IPM, NY IPM, and Premier Anesthesia have listed the same phone number in the National Provider Identifier Registry. *See* Exhibits J–L.

41.     NJ IPM lists its address as 3848 Park Avenue, Suite 101, Edison, New Jersey on the National Provider Identifier Registry and advertises 3848 Park Avenue, Edison, New Jersey among its locations. *See* Exhibits J and M. Upon information and belief, this is the same address as Park Ave SC.

42.     NJ IPM lists its principal address as 1001 Clifton Avenue, Suite 2A, Clifton, New Jersey with the New Jersey Secretary of State, which is the same address that Springfield SC lists with the New Jersey Secretary of State. *See* Exhibits A and N.

43.     NJ IPM's website lists 13 locations in New Jersey and New York, including 105 Morris Avenue, Springfield Township, New Jersey. *See* Exhibit M. Upon information and belief, this is the same address as Springfield SC's facility.

44.     This is the same address that Springfield SC reported to the National Provider Identifier Registry as its primary practice address. *See* Exhibit O.

45.     Premier Anesthesia lists its primary practice address as 105 Morris Avenue, Floor 1, Springfield, New Jersey in the National Provider Identifier

Registry. *See* Exhibit L. Upon information and belief, this is the same address as Springfield SC and one of NJ IPM's locations.

46.     When a patient receives medical services at an ambulatory surgery center, such as Springfield SC, the facility bills the patient or their insurer for facility-based services such as nursing care, radiological studies, medication used during procedures, etc. The provider performing the medical service separately bills the insurer or the patient for the provider's professional services.

## II.     In-Network vs. Out-of-Network and the No Surprises Act

47.     An in-network provider is a healthcare facility or professional that has entered into a contract with a health insurance company, such as Aetna, to provide certain medical services to insured patients at agreed-upon rates. These providers participate in the insurer's network, meaning they agree to accept the payment terms and policies set by the insurer, typically resulting in patients paying lower out-of-pocket costs when using in-network providers compared to out-of-network providers.

48.     Out-of-network providers are eligible for payment for certain medical services rendered to patients who participate in health insurance plans, including certain plans offered by Aetna. However, because out-of-network providers do not have a contractual relationship with Aetna, they often charge much higher amounts than Aetna would pay to an in-network provider. Aetna generally pays the amount the patient's health insurance plan allows for the service, and out-of-network

providers then directly bill patients for any remaining balance.

49.    The No Surprises Act (the "NSA") was passed in 2020 as part of the Consolidated Appropriations Act and went into effect January 1, 2022. *See* Public L. No. 116-260, 134 Stat. 1182, Division BB (2020).

50.    The NSA is a federal law "intended to protect patients from 'surprise' medical bills by limiting the amount an insured patient will pay for emergency services furnished by an out-of-network provider." *Tex. Med. Ass'n v. United States Dep't of Health & Human Servs*., 110 F.4th 762, 767 (5th Cir. 2024). "The Act also limits the amount an insured patient will pay for certain non-emergency services furnished by an out-of-network provider at an in-network facility." *Id*. at 767–68.

51.    The NSA established a detailed process by which out-of-network providers such as Drs. Poonia and Sharma, and health insurers, such as Aetna, can resolve payment disputes arising from surprise medical bills, known as Independent Dispute Resolution ("IDR"). *See* 42 U.S.C. §§ 300gg-111. The IDR process is meant to "tether payment rates for surprise out-of-network bills directly to market-based prices, curbing cost growth relative to the status quo." House Committee on Education and Labor, Ban Surprise Billing Act, H.R. Rep. No. 116-615, at 57 (2020).

52.    Claims for out-of-network services rendered at in-network facilities are eligible for submission to the NSA's IDR process. *See* 42 U.S.C. §§ 300gg-

11

111(c).

53.     Under the NSA's framework, the insurer must first issue an initial payment or notice of denial of payment to a provider within 30 days after the provider submits a bill for an out-of-network service. 42 U.S.C. §§ 300gg-111(a)(1)(C)(iv), -111(b)(1)(C).

54.     If the provider disagrees with the insurer's determination, the provider may initiate a 30-day open-negotiation period with the insurer over the claim. *Id*. § 300gg-111(c)(1)(A). If the parties cannot resolve the dispute through negotiation, the parties may then proceed under the NSA's IDR process. *Id.* § 300gg-111(c)(1)(B). Either party may invoke the IDR process, and the parties may continue to negotiate even after it has been invoked. *Id.* § 300gg-111(c)(2)(B).

55.     The IDR process is "baseball-style," meaning the "provider and insurer each submits a proposed payment amount and explanation" to the IDR entity, and the IDR entity "must select one of the two proposed payment amounts." *Tex. Med. Ass'n v. United States HHS*, 587 F. Supp. 3d 528, 534 (E.D. Tex. 2022). The insurer must pay the amount determined through the IDR process to the provider "not later than 30 days after the date on which such determination is made." *Id.* § 300gg-111(c)(6).

56.     As a result of the NSA and IDR process, insurers, such as Aetna, are routinely required to pay out-of-network providers much higher amounts than would be paid to in-network providers when care is provided by an out-of-network

provider in connection with care provided by an in-network provider. *See* Sarah Kiff & Margot Sanger-Katz, *A $440,000 Breast Reduction: How Doctors Cashed In on a Consumer Protection Law*, N.Y. TIMES (Apr. 22, 2026), https://www.nytimes.com/2026/04/22/us/politics/doctors-insurers-arbitration.html (reporting that doctors have won approximately 88 percent of all arbitration cases brought against insurance companies through the IDR process).

57. In the baseball-style process, IDR entities frequently choose providers' submissions of extremely high prices for medical procedures, resulting in health insurers such as Aetna paying out-of-network providers much higher amounts than the patient's plan allows for a particular service. *Id*.[2]

58. Aware of the likelihood of success in the IDR process, some out-of-network providers, including Defendants Poonia, Sharma, IPM, NYIPM, and Premier Anesthesia, fraudulently inflate reimbursement amounts when submitting a claim for medical services rendered in connection with in-network services.

59. Moreover, the payment amount that out-of-network providers receive through the IDR process for a medical service is significantly more than an in-network provider would receive for that same medical service.

---

[2] By one estimate, health insurance companies paid out-of-network providers *$2.24 billion* more than they would have paid but for the IDR process in 2023 and 2024. Jack Hoadley and Kenneth Watts, "The Substantial Costs Of The No Surprises Act Arbitration Process," Health Affairs (Aug. 25, 2025), available at https://www.healthaffairs.org/content/forefront/substantial-costs-no-surprises-act-arbitration-process. During that period, the average award to prevailing providers was nearly *four times* the amount that would have been paid had the providers been in-network. *Id.*

### III.    Defendants' Scheme

60.    Defendants collected tens of millions of dollars in reimbursement for out-of-network services from Aetna to which they were not entitled by engaging in thousands of self-referrals from their in-network Surgery Centers to their out-of-network NJ IPM, NY IPM, and Premier Anesthesia practices and out-of-network providers.

61.    The Springfield SC Facility Agreement, Park Ave SC Facility Agreement, and Brookline SC Facility Agreement (collectively, the "Facility Agreements") have virtually identical terms, requiring the in-network Surgery Centers to, among other things, comply with Aetna Policies and Participation Criteria. *See* Exhibit A (Springfield SC Facility Agreement), at ¶ 1.1(d); Exhibit E (Park Ave SC Facility Agreement) at ¶ 1.1(d); Exhibit H (Brookline SC Facility Agreement), at ¶ 1.1(d).

62.    Aetna's Participation Criteria, in turn, has at all relevant times required that "[a]ll providers rendering services to members at facility must be participating." *See*, *e.g.*, Exhibit P (2023 Participation Criteria), at 10. In other words, the Surgery Centers agreed that all patients insured under Aetna health plans would only be treated by in-network providers at those Surgery Centers.

63.    However, Drs. Poonia and Sharma used their in-network Surgery Centers to attract patients insured under Aetna health plans and then provided services at the surgery center as out-of-network providers, or had other out-of-

14

network providers under their employment provide services, billing for those services at rates much higher than those paid to in-network providers.

64. Even after Aetna terminated its Facility Agreement with Springfield SC, Defendants used Park Ave SC and Brookline SC to continue to bill for services rendered at those facilities by out-of-network providers.

65. The Facility Agreements prohibited the Surgery Centers from accepting "any referral from persons or entities that have a financial interest" in the Surgery Centers, unless that interest was disclosed in advance to Aetna. Exhibit A, at ¶ 1.1(k); Exhibit E, at ¶ 1.1(k), Exhibit H, at ¶ 1.1(k).

66. Defendants have a financial interest in Springfield SC because Dr. Poonia is its owner and sole member and Dr. Sharma is its president. *See* Exhibits A and B.

67. Defendants have a financial interest in Park Ave SC because Dr. Sharma is its sole member. *See* Exhibit E.

68. Defendants have a financial interest in Brookline SC because Dr. Sharma is its managing member. *See* Exhibit I.

69. Nonetheless, the Surgery Centers routinely and knowingly referred patients to NJ IPM, NY IPM, and Premier Anesthesia and their out-of-network providers (including Dr. Poonia and Dr. Sharma) without disclosing their shared financial interest to Aetna.

70. The Facility Agreements also prohibited the Surgery Centers from

15

making "any referral to persons or entities in which Facility has a Financial interest," unless that interest was disclosed in advance to Aetna. Exhibit A, at ¶ 1.1(k); Exhibit E, at ¶ 1.1(k); Exhibit H, at ¶ 1.1(k).

71.    The Surgery Centers had a financial interest in NJ IPM, NY IPM, and Premier Anesthesia because they were under Dr. Poonia and Dr. Sharma's common ownership and control and operated in coordination for their mutual financial benefit.

72.    Nonetheless, the Surgery Centers routinely referred patients to NJ IPM, NY IPM, and Premier Anesthesia and their out-of-network providers (including Dr. Poonia and Dr. Sharma) without disclosing their shared financial interest to Aetna.

73.    The Surgery Centers further agreed to comply with Company Policies set forth in the Provider Manual. Exhibit A, at ¶ 1.3; Exhibit E, at ¶ 1.3; Exhibit H, at ¶ 1.3.

74.    The Provider Manual, in turn, required the Surgery Centers to "notify Aetna in writing any time you obtain a financial ownership interest in a provider that may be utilized for referrals or treatment of Aetna members." *See*, *e.g.*, Exhibit Q, at 34.

75.    The Surgery Centers failed to notify Aetna of their shared financial ownership interest in and operational relationship with NJ IPM, NY IPM, and Premier Anesthesia, each of which were utilized for referrals or treatment of Aetna

16

members.

76.     Dr. Poonia, NJ IPM, NY IPM, and Premier Anesthesia had actual knowledge of and participated in the scheme to inflate reimbursements. Dr. Poonia's knowledge is attributable to NJ IPM, NY IPM, and Premier Anesthesia as their owner and/or officer. Furthermore, he personally participated in, directed, and/or benefited from the fraudulent referral-and-billing practices alleged herein.

77.     Upon information and belief, Dr. Sharma, who executed the Park Ave SC Facility Agreement and is Brookline SC's managing member, had actual knowledge of and participated in the scheme to inflate reimbursements, and she also personally participated in, directed, and/or benefited from the fraudulent referral-and-billing practices alleged herein.

78.     At a minimum, Dr. Sharma was aware of numerous referrals from the in-network Surgery Centers to out-of-network NJ IPM, as she is the president of Springfield SC, sole member of Park Ave SC, managing member of Brookline SC, and president and sole member of NJ IPM.

79.     Dr. Sharma's knowledge is also attributable to NJ IPM as its president and sole member.

80.     Although Springfield SC entered into the Facility Agreement effective May 1, 2020, Defendants' improper billing scheme began in 2022 (after the NSA was enacted), and continued until Aetna terminated the Facility Agreement effective March 27, 2026 (*see* Exhibit R), after discovering Defendants' fraud in or

17

about February/March 2026.

81.    NY IPM, NJ IPM, and Premier Anesthesia's providers billed Aetna for out-of-network services rendered at the Springfield SC and received total payment from Aetna in excess of $50 million from February 2022 through April 2026. A spreadsheet identifying some of these out-of-network payments is attached hereto as <u>Exhibit S</u>. Confidential private health information has been redacted from the aforementioned spreadsheet.

82.    By way of example and not limitation, Defendants submitted the following claims for payment for out-of-network services rendered on the same date that in-network services were rendered to those same patients at Springfield SC, knowing that Aetna would not have paid the higher out-of-network rate had it been aware of Defendants' self-dealing:

   a.  Claim ID EBY2H63H502: NY IPM billed Aetna for two services under this claim, for $25,500 and $12,750 respectively, for an out-of-network claim for services rendered at Springfield SC by Dr. Poonia on October 3, 2024. Aetna was ordered to pay the full amount of the $25,500 portion of the claim and $11,180 of the $12,750 portion of the claim following an IDR dispute over the payment. The amount listed for these services on the Aetna market fee schedule was $329.82.  This claim was eligible for IDR under the NSA because the services were provided by an out-of-network provider at an in-

network facility. Had Aetna been aware of the self-dealing scheme, it would have terminated the Facility Agreement, this claim would not have been eligible for submission through the IDR process. Defendants submitted this claim from New Jersey and New York across state lines to Aetna in Connecticut via electronic communications through the Internet.

b.  Claim ID EYPDGYWVJ01: NJ IPM billed Aetna for $46,500 for an out-of-network claim for services rendered by Springfield SC on October 28, 2024. Aetna was ordered to pay nearly the full amount, $43,500, following an IDR dispute over the payment. The amount listed for these services on the Aetna market fee schedule was $353.77. This claim was eligible for IDR under the NSA because the services were provided by an out-of-network provider at an in-network facility. Had Aetna been aware of the self-dealing scheme, it would have terminated the Facility Agreement, this claim would not have been eligible for submission through the IDR process. Defendants submitted this claim from New Jersey and New York across state lines to Aetna in Connecticut via electronic communications through the Internet.

c.  Claim ID EBY2M2ZNV01: NJ IPM billed Aetna for $43,500 for an out-of-network claim for services rendered on April 5, 2025. Aetna

was ordered to pay the full amount following an IDR dispute over the payment. The amount listed for these services on the Aetna market fee schedule was $353.77. This claim was eligible for IDR under the NSA because the services were provided by an out-of-network provider at an in-network facility. Had Aetna been aware of the self-dealing scheme, it would have terminated the Facility Agreement, this claim would not have been eligible for submission through the IDR process. Defendants submitted this claim from New Jersey and New York across state lines to Aetna in Connecticut via electronic communications through the Internet.

d.  Claim ID EATYNNHNP01: NJ IPM billed Aetna for $43,500 for an out-of-network claim for services provided at Springfield SC on May 5, 2025. Aetna was ordered to pay the full amount following an IDR dispute over the payment. The amount listed for these services on the Aetna market fee schedule was $353.77. This claim was eligible for IDR under the NSA because the services were provided by an out-of-network provider at an in-network facility. Had Aetna been aware of the self-dealing scheme, it would have terminated the Facility Agreement, this claim would not have been eligible for submission through the IDR process. Defendants submitted this claim from New Jersey and New York across state lines to Aetna in Connecticut via

20

electronic communications through the Internet.

e.  Claim ID ELPDP2P9601: NJ IPM billed Aetna for $25,500 for an out-of-network claim for services performed at Springfield SC on July 30, 2025. Aetna was ordered to pay nearly the full amount, $25,478.16, following an IDR dispute over the payment. The amount listed for these services on the Aetna market fee schedule was $75.28. This claim was eligible for IDR under the NSA because the services were provided by an out-of-network provider at an in-network facility. Had Aetna been aware of the self-dealing scheme, it would have terminated the Facility Agreement, this claim would not have been eligible for submission through the IDR process. Defendants submitted this claim from New Jersey and New York across state lines to Aetna in Connecticut via electronic communications through the Internet.

f.  Claim ID ERNSS1PW102: Premier Anesthesia billed Aetna for $10,500 for an out-of-network claim for services performed at Springfield SC on April 17, 2026. Aetna was ordered to pay the full amount following an IDR dispute over the payment. The amount listed for these services on the Aetna market fee schedule was $117.79. This claim was eligible for IDR under the NSA because the services were provided by an out-of-network provider at an in-

network facility. Had Aetna been aware of the self-dealing scheme, it would have terminated the Facility Agreement, this claim would not have been eligible for submission through the IDR process. Defendants submitted this claim from New Jersey and New York across state lines to Aetna in Connecticut via electronic communications through the Internet.

83.    Aetna paid Defendants for services at higher rates than it would have paid to in-network providers for the same services, including as a result of payments ordered through the IDR process.

84.    Defendants materially misrepresented the out-of-network claims submitted to Aetna, with full knowledge that the out-of-network claims were not payable because they were submitted in violation of the Facility Agreements' prohibitions on (1) out-of-network providers rendering services to Aetna-insured patients at the in-network Surgery Centers, and (2) referrals between entities with an undisclosed shared financial interest.

85.    But for Defendants' material misrepresentations regarding the payability of the out-of-network claims, Aetna would have properly denied the out-of-network claims in their entirety and would not have paid tens of millions of dollars to the out-of-network Defendants.

86.    Defendants scheme also enabled them to receive inflated payments through the IDR process for claims that were not eligible for IDR.

22

87.    Beginning in March 2026, Defendants expanded their scheme and began using Park Avenue SC and Brookline SC to continue their fraud, billing Aetna for at least $3,014,862.

88.    Defendants did so even after receiving Aetna's letter terminating the Springfield SC Facility Agreement, which letter explained that Aetna was terminating the agreement "because provider has failed to abide by the requirements of [Aetna's] applicable participation criteria. Specifically, that '[a]ll providers rendering services to members at facility must be participating.'" Exhibit S.

89.    Because these claims are more recent, not all claims have been adjudicated internally within Aetna and Defendants have not yet had the opportunity to submit the claims that have been paid to the IDR process.

90.    Prior to discovering Defendants' fraudulent scheme, Aetna made payments in excess of $50 million.

91.    However, upon information and belief, Defendants intend to seek inflated reimbursements through the IDR process for these claims.

92.    Defendants also fraudulently submitted claims for in-network facility fees that Defendants knew were not eligible for reimbursement because the services provided in connection therewith were rendered by out-of-network providers.

93.    Defendants have fraudulently profited tens of millions of dollars from

Aetna as a result of their scheme, with the vast majority of their profits being in the form of inflated payments to the out-of-network providers, NJ IPM, NY IPM, Premier Anesthesia, Dr. Poonia, and Dr. Sharma.

## COUNT I
## VIOLATION OF NEW JERSEY INSURANCE FRAUD PREVENTION ACT, § 17:33A-1-30
**(Against All Defendants)**

94.     Aetna restates and realleges the allegations set forth in Paragraphs 1 through 93 as if fully set forth herein.

95.     Aetna is an insurer within the meaning of the IFPA and paid health insurance benefits as a result of and in reliance on health insurance claims submitted or caused to be submitted by Defendants.

96.     Defendants are practitioners within the meaning of the IFPA and committed, participated in, solicited others to engage in, and knowingly assisted, conspired with, or urged others to commit the fraudulent and wrongful acts set forth herein.

97.     It is a violation of the IFPA to "[p]resent[] or cause[] to be presented any written or oral statement as part of, or in support of . . . a claim for payment or other benefit pursuant to an insurance policy . . . knowing that the statement contains any false or misleading information concerning any fact or thing material to the claim." N.J.S.A. 17:33A-4(a)(1).

98.     It is a further violation of the IFPA to "conceal[] or knowingly fail[]

24

to disclose the occurrence of an event which affects any person's initial or continued right or entitlement to (a) any insurance benefit or payment or (b) the amount of any benefit or payment to which the person is entitled." N.J.S.A. 17:33A-4(a)(3).

99.    In violation of the IFPA, from approximately 2022 through approximately May 2026, Defendants presented or caused to be presented to Aetna claims for payment, expressly or impliedly certifying that those claims were eligible for reimbursement, while knowing that such claims were not so eligible because Defendants failed to disclose their self-dealing.

100.   In submitting or causing insurance claims to be submitted to Aetna for payment, Defendants acted knowingly and intended that Aetna rely on the information contained in the false health insurance claims in issuing payment on the claims.

101.   In reasonable reliance on and as a result of the misrepresentations on claims Defendants submitted or caused to be submitted, Aetna paid Defendants in excess of $50 million.

102.   A person that engages in a pattern of fraudulent behavior under the IFPA is liable to the insurer for treble damages. *See* N.J.S.A. 17.33A-7(b).

103.   The IFPA defines a "pattern" as five or more "related violations." *See* N.J.S.A. 17:33A-3. Violations are related if they involve either the same victim, or same or similar actions on the part of the person or practitioner charged with

violating the IFPA. *See* N.J.S.A. 17.33A-3.

104.   As a result of Defendants' scheme to defraud and pattern of violations of the IFPA, Aetna suffered damages including, but not limited to, all amounts paid by Aetna as a result of the submission of, or causing others to submit, false and fraudulent claims for reimbursement, costs of investigation, costs of suit, and attorneys' fees, all of which are specifically authorized as compensatory damages under the IFPA. *See* N.J.S.A. 17:33A-7.

105.   As a result of Defendants' pattern of violation of the IFPA, Aetna is entitled to an award of treble damages under the IFPA. *See id*.

**COUNT II**
**COMMON LAW FRAUD**
**(Against All Defendants)**

106.   Aetna restates and realleges the allegations set forth in Paragraphs 1 through 105 as if fully set forth herein.

107.   Defendants made a material misrepresentation each time they presented or caused to be presented to Aetna claims for payment, expressly or impliedly certifying that those claims were eligible for reimbursement, while knowing that such claims were not so eligible because Defendants failed to disclose their self-dealing.

108.   Defendants further made material misrepresentations of fact each time they submitted a disputed claim through the IDR process and, nearly always, received a higher amount than Aetna had initially paid, despite Defendants'

26

knowledge that such claims were not eligible for any payment, let alone adjudication through the IDR process, because the claims had been submitted in violation of the Facility Agreements.

109.  Defendants knew the misrepresentation to be material and intended Aetna to rely on the misrepresentation every time Defendants submitted a claim to Aetna for payment or pursued a higher reimbursement amount through the IDR process.

110.  Aetna relied on Defendants' material misrepresentations and suffered damages in the form of payment to Defendants of tens of millions of dollars to which Defendants were not entitled.

111.  Defendants are liable to Aetna for punitive damages for their conduct.

## COUNT III
## Violation of RICO, 18 U.S.C. § 1962(c)
## (Against All Defendants)

112.  Aetna restates and realleges the allegations set forth in Paragraphs 1 through 111 as if fully set forth herein.

113.  Springfield SC, Park Ave SC, Brookline SC, NJ IPM, and NY IPM constitute an association-in-fact enterprise (the "Enterprise") as that term is defined in 18 U.S.C. 1961(4), that engages in, and the activities of which, affect interstate commerce. The members of the Enterprise are and have been associated through time, joined in purpose and organized in a manner amenable to hierarchal and consensual decision making, with each member fulfilling a specific and necessary

27

role to carry out and facilitate its common purpose. Specifically, Springfield SC, Park Ave SC, Brookline SC, NJ IPM, and NY IPM ostensibly are independent entities—with different names and tax identification numbers—that were created as vehicles to achieve a common purpose—namely, to facilitate the submission of fraudulent inflated charges to Aetna. The Enterprise has operated under several separate corporate names in order to reduce the number of bills submitted under any individual name, in an attempt to avoid attracting Aetna's attention to and scrutiny of the volume of billing and the pattern of fraudulent charges originating from any one entity within the Enterprise, and in order to conceal Defendants' illegal self-referral scheme. Accordingly, the carrying out of this scheme would be beyond the capacity of each member of the Enterprise acting individually or without the aid of each other.

114.   The Enterprise is distinct from and has an existence beyond the pattern of racketeering described herein, namely by recruiting, employing, overseeing, and coordinating many professionals and non-professionals who have been responsible for facilitating and performing a wide variety of administrative and professional functions beyond the acts of wire fraud (i.e., the submission of fraudulent claims for payment), by creating and maintaining patient files and other records, by recruiting and supervising personnel, by negotiating and executing various contracts, and by maintaining the bookkeeping and accounting functions necessary to manage the receipt and distribution of the insurance proceeds.

28

115. 18 U.S.C. § 1962(c) makes it "unlawful for any person employed by or associated with any enterprise engaged in, or the activities of which affect, interstate or foreign commerce, to conduct or participate, directly or indirectly, in the conduct of such enterprise's affairs through a pattern of racketeering activity . . . ." 18 U.S.C. 1962(c).

116. Dr. Poonia and Dr. Sharma were employed by and/or associated with the Enterprise.

117. Defendants each participated individually, directly or indirectly, in the conduct of the Enterprise's affairs through a pattern of racketeering activity within the past ten years consisting of repeated violations of the federal wire fraud statute, 18 U.S.C. § 1343, based upon the interstate use of electronic communications to submit or cause to be submitted thousands of fraudulent insurance claims on a continuous basis from approximately 2022 through approximately May 2026 seeking inflated payments that Defendants were not eligible to receive because the claims were submitted as part of a fraudulent self-dealing scheme.

118. Violation of the federal wire fraud statute constitutes "racketeering activity under" 18 U.S.C. § 1961(1)(B).

119. Defendants violated the federal wire fraud statute each and every time they used electronic communications to submit a fraudulently inflated claim for reimbursement to Aetna through use of electronic communications, including but not limited to the specific claims set forth above in ¶ 82.

120.   With the submission of each fraudulently inflated claim, Defendants misrepresented to Aetna that each claim was eligible for reimbursement, intending Aetna to rely on that misrepresentation to Aetna's detriment.

121.   Aetna did in fact rely on ICO Defendants' misrepresentations each time Aetna made payment on the fraudulently inflated claims.

122.   Each Defendant, at all relevant times, is and has been a "person" within the meaning of 18 U.S.C. § 1961(3), because each Defendant can hold, and does hold, "a legal or beneficial interest in property."

123.   Because there were more than two acts of racketeering within ten years, Defendants' conduct constitutes a "pattern" of racketeering activity. 18 U.S.C. § 1961(5).

124.   Each RICO Defendant was involved in the orchestration, planning, preparation, and execution of the scheme to fraudulently submit inflated claims for reimbursement to Aetna.

125.   Defendants' conduct affected interstate commerce because the claims for reimbursement were sent from New York and/or New Jersy to Aetna in Connecticut.

126.   As a result of Defendants' actions, Aetna has suffered tens of millions of dollars in damages to its business and property in the form of payments made on claims that were submitted as part of Defendants' racketeering scheme. Because of Defendants' violations of 18 U.S.C. 1962(c), Aetna is entitled to compensatory and

treble damages in an amount to be determined at trial, as well as costs and fees.

## COUNT IV
### Conspiracy to Violate RICO, 18 U.S.C. § 1962(d)
### (Against All Defendants)

127.  Aetna restates and realleges the allegations set forth in Paragraphs 1 through 126 as if fully set forth herein.

128.  In violation of 18 U.S.C. § 1962(d), Defendants conspired to violate the provisions of 18 U.S.C. 1962(c) in that they knowingly agreed and conspired to participate in, directly or indirectly, the affairs of an enterprise through the pattern of racketeering activity described above. The racketeering activity could not have occurred without the consent and knowing collusion of each Defendant.

129.  As part of, and to advance, their conspiracy, Defendants agreed to and conspired in the commission of the predicate acts described above, with knowledge that those acts were in furtherance of the pattern of racketeering activity.

130.  As set forth above in ¶¶ 112−26, each Defendant agreed to and did commit at least two predicate acts of racketeering.

131.  As a result of Defendants' actions, Aetna has suffered tens of millions of dollars in damages to its business and property in the form of payments made on claims that were submitted as part of Defendants' racketeering scheme. Because RICO Defendants' violations of 18 U.S.C. 1962(d), Aetna is entitled to compensatory and treble damages in an amount to be determined at trial, as well as costs and fees.

31

## COUNT V
### Violation of New Jersey RICO Act, N.J.S.A. § 2C:41–1, *et seq.*
### (Against All Defendants)

132.    Aetna restates and realleges the allegations set forth in Paragraphs 1 through 131 as if fully set forth herein.

133.    Springfield SC, Park Ave SC, Brookline SC, NJ IPM, and NY IPM constitute an association-in-fact enterprise (the "Enterprise") as that term is defined in N.J.S.A. § 2C:41-1(c). The members of the Enterprise are and have been associated through time, joined in purpose and organized in a manner amenable to hierarchal and consensual decision making, with each member fulfilling a specific and necessary role to carry out and facilitate its common purpose. Specifically, Springfield SC, Park Ave SC, Brookline SC, NJ IPM, and NY IPM ostensibly are independent entities—with different names and tax identification numbers—that were created as vehicles to achieve a common purpose—namely, to facilitate the submission of fraudulent inflated charges to Aetna. The Enterprise has operated under several separate corporate names in order to reduce the number of bills submitted under any individual name, in an attempt to avoid attracting Aetna's attention to and scrutiny of the volume of billing and the pattern of fraudulent charges originating from any one entity within the Enterprise, and in order to conceal Defendants' illegal self-referral scheme. Accordingly, the carrying out of this scheme would be beyond the capacity of each member of the Enterprise acting individually or without the aid of each other.

32

134.   The Enterprise is distinct from and has an existence beyond the pattern of racketeering described herein, namely by recruiting, employing, overseeing, and coordinating many professionals and non-professionals who have been responsible for facilitating and performing a wide variety of administrative and professional functions beyond the acts of wire fraud (i.e., the electronic submission of fraudulent claims for payment), by creating and maintaining patient files and other records, by recruiting and supervising personnel, by negotiating and executing various contracts, and by maintaining the bookkeeping and accounting functions necessary to manage the receipt and distribution of the insurance proceeds.

135.   N.J.S.A. 2C:41-2(c) makes it "unlawful for any person employed by or associated with any enterprise engaged in or activities of which affect trade or commerce to conduct or participate, directly or indirectly, in the conduct of the enterprise's affairs through a pattern of racketeering activity . . .." N.J.S.A. 2C:41-2(c).

136.   Dr. Poonia and Dr. Sharma were employed by and/or associated with the Enterprise.

137.   Each Defendant knowingly conducted and/or participated individually, directly or indirectly, in the conduct of the Enterprise's affairs through a pattern of racketeering activity under within the past ten years consisting of repeated violations of the federal wire fraud statute, 18 U.S.C. § 1343, based

upon the interstate use of electronic communications to submit or cause to be submitted thousands of fraudulent insurance claims on a continuous basis from approximately 2022 through approximately May 2026 seeking inflated payments that Defendants were not eligible to receive because the claims were submitted as part of a fraudulent self-dealing scheme.

138.   Any conduct defined as "racketeering activity" under 18 U.S.C. § 1961(1)(A), (B), and (D) constitutes racketeering activity under the New Jersey RICO Act. *See* N.J.S.A. 2C-41-1(a)(2). 18 U.S.C. § 1961(1)(B), in turn, provides that violation of the federal wire fraud statute, , 18 U.S.C. § 1343 constitutes "racketeering activity under" 18 U.S.C. § 1961(1)(B).

139.   As described in detail above in ¶¶ 117−119, RICO Defendants repeatedly violated the federal wire fraud statute.

140.   Each Defendant, at all relevant times, is and has been a "person" within the meaning of N.J.S.A. § 2C:41-1(b), because each RICO Defendant can hold, and does hold, "a legal or beneficial interest in property."

141.   Because there were more than two acts of racketeering within ten years embracing criminal conduct with the same or similar purpose, results, participants/victims and method of commission—i.e., obtaining payment from Aetna for fraudulently inflated claims—RICO Defendants' conduct constitutes a "pattern" of racketeering activity. N.J.S.A. § 2C:41-1(d).

142.   Each Defendant was involved in the orchestration, planning,

preparation, and execution of the scheme to fraudulently submit inflated claims for reimbursement to Aetna.

143. As a result of Defendants' actions, Aetna has suffered tens of millions of dollars in damages to its business and property in the form of payments made on claims that were submitted as part of RICO Defendants' racketeering scheme. Because of RICO Defendants' violations of N.J.S.A. § 2C:41-1, *et seq.*, Aetna is entitled to compensatory and treble damages in an amount to be determined at trial, as well as costs and fees.

**COUNT VI**
**Conspiracy to Violate New Jersey RICO Act, N.J.S.A. § 2C:41–1, *et seq.***
**(Against All Defendants)**

144. Aetna restates and realleges the allegations set forth in Paragraphs 1 through 143 as if fully set forth herein.

145. In violation of N.J.S.A. § 2C:41-2(d), RICO Defendants conspired to violate the provisions of N.J.S.A. § 2C:41–1, *et seq.*, in that they knowingly agreed and conspired to participate in, directly or indirectly, the affairs of an enterprise through the pattern of racketeering activity described above. The racketeering activity could not have occurred without the consent and knowing collusion of each RICO Defendant.

146. As part of, and to advance, their conspiracy, RICO Defendants agreed to and conspired in the commission of the predicate acts described above, with knowledge that those acts were in furtherance of the pattern of racketeering

activity.

147.   As set forth above in ¶¶ 112–26, each RICO Defendant agreed to and did commit at least two predicate acts of racketeering.

148.   As a result of RICO Defendants' actions, Aetna has suffered tens of millions of dollars in damages to its business and property in the form of payments made on claims that were submitted as part of RICO Defendants' racketeering scheme. Because of RICO Defendants' violations of N.J.S.A. § 2C:41-1, *et seq.*, Aetna is entitled to compensatory and treble damages in an amount to be determined at trial, as well as costs and fees.

## COUNT VII
## UNJUST ENRICHMENT
### (Against All Defendants)

149.   Aetna restates and realleges the allegations set forth in Paragraphs 1 through 148 as if fully set forth herein.

150.   Defendants received a benefit from Aetna, namely, tens of millions of dollars in health insurance reimbursements for claims that Defendants knew were not eligible for reimbursement.

151.   The circumstances surrounding the payment of claims are such that it would be unjust for Defendants to retain the benefit of Aetna's payments.

## COUNT VIII
## TORTIOUS INTERFERENCE WITH CONTRACT – SPRINGFIELD SC
### (Against Dr. Poonia, Dr. Sharma, NJ IPM, NY IPM, and Premier Anesthesia)

152.   Aetna restates and realleges the allegations set forth in Paragraphs 1

through 151 as if fully set forth herein.

153.   An existing contractual relationship existed between Aetna and Springfield SC in the form of the Springfield SC Facility Agreement.

154.   Dr. Poonia had knowledge of the Springfield SC Facility Agreement and its terms because he signed the agreement and is Springfield SC's sole member.

155.   Upon information and belief, Dr. Sharma had knowledge of the Springfield SC Facility Agreement and its terms because she is Springfield SC's president and registered agent.

156.   Dr. Poonia and Dr. Sharma's knowledge is attributable to NJ IPM, NY IPM, and Premier Anesthesia, which entities received tens of millions of dollars in fraudulent payments.

157.    Dr. Poonia, Dr. Sharma, NJ IPM, NY IPM, and Premier Anesthesia intentionally and maliciously interfered with Aetna and Springfield SC's contractual relationship by orchestrating the above-described scheme to manipulate Springfield SC's in-network status to engage in referrals that resulted in inflated payments.

158.   Dr. Poonia, Dr. Sharma, NJ IPM, NY IPM, and Premier Anesthesia caused Springfield SC to breach the Springfield SC Facility Agreement, resulting in Aetna being forced to terminate the agreement.

159.   Aetna suffered tens of millions of dollars in damages as a result of Dr.

Poonia, Dr. Sharma, NJ IPM, NY IPM, and Premier Anesthesia's tortious interference, and further suffered the loss of the benefit of the Springfield SC Facility Agreement.

## COUNT IX
## TORTIOUS INTERFERENCE WITH CONTRACT – PARK AVE SC
### (Against Dr. Poonia, Dr. Sharma, and NJ IPM)

160.   Aetna restates and realleges the allegations set forth in Paragraphs 1 through 159 as if fully set forth herein.

161.   An existing contractual relationship existed between Aetna and Park Ave SC in the form of the Park Ave SC Facility Agreement.

162.   Dr. Sharma had knowledge of the Park Ave SC Facility Agreement and its terms because she signed the agreement and is Park Ave SC's sole member.

163.   Upon information and belief, Dr. Poonia also had knowledge of the Park Ave SC Facility Agreement and its terms.

164.   Dr. Poonia and Dr. Sharma's knowledge is attributable to NJ IPM, the entity that received fraudulent payments.

165.   Dr. Poonia, Dr. Sharma, NJ IPM, and NY IPM intentionally and maliciously interfered with that relationship by orchestrating the above-described scheme to manipulate Park Ave SC's in-network status to engage in referrals that resulted in inflated payments.

166.   Dr. Poonia, Dr. Sharma, and NJ IPM caused Park Ave SC to breach the Park Ave SC Facility Agreement, resulting in Aetna being forced to terminate

38

the agreement.

167.   Aetna suffered damages in an amount to be determined at trial as a result of Dr. Poonia, Dr. Sharma, and NJ IPM's scheme, and further suffered the loss of the benefit of the Park Ave SC Facility Agreement.

## COUNT X
## TORTIOUS INTERFERENCE WITH CONTRACT – BROOKLINE SC
### (Against Dr. Poonia, Dr. Sharma and NJ IPM)

168.   Aetna restates and realleges the allegations set forth in Paragraphs 1 through 167 as if fully set forth herein.

169.   An existing contractual relationship existed between Aetna and Brookline SC in the form of the Brookline SC Facility Agreement.

170.   Dr. Sharma had knowledge of the Brookline SC Facility Agreement as its managing member.

171.   Upon information and belief, Dr. Poonia also had knowledge of the Brookline SC Facility Agreement and its terms.

172.   Dr. Poonia and Dr. Sharma's knowledge is attributable to NJ IPM, the entity that received fraudulent payments.

173.   Dr. Poonia, Dr. Sharma, and NJ IPM intentionally and maliciously interfered with that relationship by orchestrating the above-described scheme to manipulate Brookline SC's in-network status to engage in referrals that resulted in inflated payments.

174.   Dr. Poonia, Dr. Sharma, and NJ IPM, caused Park Ave SC to breach

39

the Brookline SC Facility Agreement, resulting in Aetna being forced to terminate the agreement.

175.   Aetna suffered damages in an amount to be determined at trial as a result of Dr. Poonia, Dr. Sharma, and NJ IPM's scheme, and further suffered the loss of the benefit of the Brookline SC Facility Agreement.

## JURY DEMAND

Aetna demands a jury trial on all issues so triable.

## CLAIM FOR RELIEF

**WHEREFORE**, Plaintiffs Aetna Network Services LLC and Aetna Life Insurance Company respectfully requests that this Court:

a.    Enter judgment in favor of Aetna and against Defendants on each and every Count of the Complaint;

b.    Award Aetna actual, punitive, and treble damages;

c.    An award of attorney's fees, interest, and cost of suit;

d.    Granting Aetna other relief as the Court may deem just and equitable.

Dated: June 5, 2026

Respectfully submitted,

**ROBINSON & COLE LLP**

By: */s/ Adam J. Petitt*
Adam J. Petitt, Esq.
(N.J. ID # 020822008)
1055 Washington Boulevard
Stamford, CT 06901
Tel: (203) 462-7564
Email: apetitt@rc.com

Seth B. Orkand, Esq.
(*Pro Hac forthcoming*)
Julianna M. Charpentier, Esq.
(*Pro Hac forthcoming*)
53 State Street, 32nd Floor
Boston, MA  02109
Tel.:  (617) 557-5900
Email:  sorkand@rc.com
          jcharpentier@rc.com

*Attorneys for Plaintiffs Aetna Network Services LLC and Aetna Life Insurance Company*

41